FILED

2004 AUG -3  A 10: 11

U.S. DISTRICT COURT
  HARTFORD, CT.

STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE CONNECTICUT INDEMNITY COMPANY, | : | CASE NO.: 301 CV 1410 (RNC) |
| Plaintiff, | : | |
| v. | : | |
| FRANK PERROTTI, JR., | : | |
| Defendant. | : | AUGUST 2, 2004 |

## DEFENDANT'S TRIAL MEMORANDUM OF LAW

Defendant, Frank Perrotti, Jr. ("Perrotti") by his attorneys, Senning & Rieder, hereby submits its trial memorandum.

## STATEMENT OF THE CASE

CIC filed this action for declaratory relief requesting that the court render an insurance policy CIC issued to Perrotti (the "CIC Policy") void ab initio. CIC claims it is entitled to this relief because, CIC alleges, Perrotti's insurance application contained material misrepresentations and/or omissions. Perrotti contends that all material information was imparted to CIC, and that CIC was in possession of said information at all relevant times. Perrotti has counterclaimed against CIC in this action and Perrotti's corporation, Clean Waste, Inc., ("Clean Waste") brought a separate action in this Court before Judge Chatigny entitled Clean Waste, Inc. v. The _____ Indemnity Company, et al., Case No. 3:0__ _____ (the "Clean Waste Action") alleging breach of contract and bad faith arising out of many of the same facts and events which are involved in the instant action. The action also named as

additional defendants the other insurance brokerages involved in the same sequence of events pertaining to the application, placement, issuance, and attempted rescission of the subject policy. Clean Waste has filed a motion to consolidate the instant action with the <u>Clean Waste Action</u>.

## **STATEMENT OF FACTS**

In the year 1999, Frank Perrotti purchased a yacht, the M/V N.E.W.S ("N.E.W.S."), through his corporation, Clean Waste, which is a Cayman Islands Corporation. Perrotti owned 100% of the stock of Clean Waste and was the director of the company. Perrotti purchased the yacht for his personal pleasure use only. Perrotti provided the funds to Clean Waste necessary to purchase the N.E.W.S.

In October 1999, Perrotti instructed Bill Taylor ("Taylor"), the manager of the N.E.W.S., to contact Perrotti's commercial insurance consultant, Jay Lorinsky ("Lorinsky") of First Nations Financial Services ("First Nations"), to obtain insurance for the yacht. As per Perrotti's instruction, Taylor contacted Lorinsky and requested that he arrange for insurance for the N.E.W.S. Taylor, in accordance with Lorinsky's requests, sent Lorinsky a copy of the purchase and sale agreement which showed Clean Waste, a Cayman Islands' Corporation was purchasing the vessel, a copy of the detailed pre-purchase survey performed by Joseph Lombardi Survey, and a copy of the résumè of Captain McCaughey who was to be the Captain of the N.E.W.S.

Lorinsky subsequently contacted Scott Hainey ("Hainey"), a commercial insurance broker at the Dunlop Agency to get insurance for the yacht. Because Hainey was not an experienced marine insurance broker, Hainey told Lorinsky that he knew of a marine insurance specialist who could arrange for the yacht insurance. Hainey then called John Sterling

("Sterling") at Marine MGA and asked if he could place the insurance on the yacht. Hainey knew about Marine MGA from their advertisement which touted that they were specialists in marine insurance for yachts. Sterling indicated that Marine MGA could place the necessary insurance on the yacht and asked for its particulars. (Exhibit A Hainey Tr. at p. 28-30).

Hainey provided Marine MGA with the pre-purchase survey prepared by Joseph Lombardi, and the memo from Taylor. The Taylor letter stated, in part, "attached please find the pre-purchase survey you requested for estimating insurance coverage."

The Lombardi Survey clearly stated the yacht was registered in the Cayman Islands, with its official homeport of Georgetown, Cayman Islands (Lombardi Survey Ex. B). The survey described the intended use of this vessel as follows:

> The prospective owner will be utilizing the boat as a personal yacht in New England waters for the summer months with the boat transiting the East Coast south in the fall <u>to points in the Gulf of Mexico and Caribbean Sea during winter</u> with return trips coastwise in the spring. With this in mind, I have been examining "Sun Chaser" to determine her suitability to perform as an <u>ocean going, blue water vessel,</u> as well as examining her present structural integrity. (Emphasis added).

Taylor's letter likewise disclosed the intended use of the yacht, and its British Registry to the underwriter:

> Can you provide an estimate for this scenario as well as an annual insurance cost assuming that the yacht will be based in Southern New ___ waters during the Summer months and <u>moving to Southerly waters in Winter months in subsequent seasons</u>. It's planned that she will serve as a private yacht for personal pleasure and occasional business meetings.

3

>As yet it has not been determined whether the yacht will <u>continue her British Registry</u>, or be returned to the U.S. (Emphasis added).

After receiving the Lombardi Survey and the Taylor memo, Sterling sent Hainey a yacht application. At this time, Sterling failed to inform Hainey that Marine MGA supposedly did not have authority to insure a Cayman Islands' registered vessel. The application <u>did</u> <u>not</u> ask for the name of the owner of the vessel or the registry of the vessel. (Hainey Tr. at 161). Hainey inserted the number "922" in the application in the section "navigation area." This was a navigational code for the following areas:

>922 Atlantic Coastal Waters–12 Months Navigation: "Warranted confirmed to the use and navigation of coastal waters and tributaries of the Atlantic Ocean and Gulf of Mexico, <u>including the Bahamas from Eastport, ME to Pensacola, Florida</u>. Emphasis added.

Hainey had three or four subsequent conversations with Sterling regarding details, and then sent Sterling the completed application.

Sterling then called Hainey and asked for the rèsumè of the Captain of the vessel. Hainey obtained the Captain's rèsumè from Lorinsky and faxed it to Sterling. (Hainey Tr. at p. 63.). Sterling then requested the yacht valuation section of the Lombardi Survey. (Hainey Tr. at p. 64). Then for a second time, Hainey faxed the entire Lombardi Survey, Taylor's letter, Perrotti's application, and the Captain's rèsumè to Sterling. On October 14, 199_ Sterling sent Hainey a quote in which he changed the navigational limits to "Northeast Coastal Waters" with "vessel laid up at Little Harbor Maine for repair during winter months."

4

On October 15, 1999, Hainey faxed the quote and the application to Lorinsky by fax cover sheet. On October 21, 1999, Hainey sent a fax to Sterling requesting that he bind the coverage. On October 26, 1999, Sterling confirmed coverage by sending a fax to the Dunlop Corporation.

On December 7, 1999, Sterling advised the Dunlop Agency that the binder was expiring and that he needed a signed application. Hainey received an application signed by Perrotti, and forwarded it to Sterling. On December 14, 1999, a policy was issued by Connecticut Indemnity Company in Connecticut to Perrotti, a Connecticut resident. On December 19, 1999, the Dunlop Agency first received the CIC Policy, which was for the period from October 19, 1999 to October 19, 2000. (Hainey Tr. at p. 73). Sterling's cover letter of December 14, 1999, which accompanied the policy, acknowledged the necessity for adjustment of the navigational warranty. Hainey had obviously addressed the navigational limits issue with him prior to that time. After receiving the CIC Policy on December 19, 1999, the Dunlop Agency forwarded the policy to First Nations on December 23, 1999. It was not until sometime in January of 2000 that Perrotti actually received a copy of the CIC Policy.

In October 2000, Mr. Blumberg, a colleague of Hainey, took a telephone call from the Captain of the N.E.W.S. He forwarded this call to Hainey. (Hainey Tr. at p. 78). Captain McGaughy informed Hainey that the vessel was ready for a voyage, and that the Captain was concerned about the navigational limits in the policy. (Hainey Tr. at p. 78).

Hainey called Sterling and gave him the Captain's phone number. Hainey told Sterling to call the Captain and make sure the navigational limits were correct because the vessel was

going to sail. The Captain advised that they were going to sail to the Cayman Islands, which was outside the navigational limits in the policy. The Captain then called Hainey to thank him for referring him to Sterling. (Hainey, Tr. at p. 80). Sterling told Hainey that he knew what the Captain required and that he was taking care of it.

During the period of time the yacht was insured by Perrotti, the yacht never sailed outside of U.S. territorial waters. The yacht went to Florida twice for repairs and a refit. Other than that, the yacht only sailed in New England waters and solely for the exclusive personal use of Perrotti.

In October 2000, Hainey forwarded to Sterling a Bill of Sale for a 22 foot Hackercraft that had been purchased by Clean Waste of Georgetown, Cayman Islands for $82,964.00, and asked Marine MGA to include it on the policy. The Bill of Sale clearly indicated that Clean Waste was the owner of the Hackercraft and that it was a Cayman Island corporation.

Sterling never asked Hainey any questions about the registry of the vessel. (Hainey Tr. at p. 144). Sterling reviewed the bill of sale for the Hackercraft and asked Hainey questions about it:

> Q. As to the bill of sale document, does that indicate to whom title was transferred of the title?
>
> A. Clean Waste, Inc.
>
> Q. And your testimony was that you faxed that document to Marine MGA?
>
> A. Yes, I did.

> Q. And did Mr. Sterling ever indicate to you that he had reviewed the bill of sale?
>
> A. He did because he had questions.
>
> Q. And what were those questions?
>
> A. One was a question of the valuation, one was a question of the use of it and the other was the construction.
>
> Q And did he ever ask you who Clean Waste, Inc. was?
>
> A. No.
>
> Q. To your knowledge, did Marine MGA add that vessel to the N.E.W.S. policy?
>
> A. Yes, they did.

(Hainey Tr. at pp. 144-145).

Sterling responded to this by sending a letter to Hainey acknowledging the request to insure the 22 foot Hackercraft. Once again, Sterling did not raise any issue with Hainey as to the Cayman registry or ownership by Clean Waste:

> This policy has come up on diary for two (2) reasons: First, we had received a note from your office in regards to the addition of an additional vessel, the v..... ....ded as a 2,000 22' Hackercraft and has a value of $82,964 according to the Bill of Sale. My question in regards ' th's vessel is whether or not it is a tender to the larger vessel, or should it be separately insured.

> Second, we have had discussions on the larger vessel in regards to increasing the amount of insurance and extending the navigation area at this point none of these changes have been made to the policy. We are still awaiting specific details.
>
> Please review and let us know.

Sterling called Hainey to say that he saw an ad for the yacht offering it for sale for $595,000.00. A photograph of the yacht was in the advertisement and it showed the yacht flying the British flag.

Hainey was surprised at Sterling's request because he had raised the issue of the navigational limit prior to the issuance of the original policy, the Captain had raised it in October 2000, and Sterling had represented to Hainey that he took care of it. Yet Sterling still had not corrected the navigational limit warranty to include Florida and the Caribbean. (Hainey Tr. at p. 88). Hainey requested the name of Sterling's superior because he had no confidence in Sterling correcting the problem since he had neglected it for over one year.

> Q.   Why do you want his superior?
>
> A.   This was the last straw for me.
>
> Q.   Why do you want his superior?
>
> A.   Because we had handled this issue in October and
>
>      obviously he's a sloup (phonetic).

(Hainey Tr. at p. 88).

Hainey spoke to Sterling about the navigational limits and told him to get it right or Hainey would go to Sterling's boss. (Hainey Tr. at p. 91). Sterling told him he was fine with the change. Hainey sent a letter to Sterling complaining that Captain John McCaughey had informed Sterling of where the vessel would navigate and Sterling still had not corrected the policy. Hainey also pointed out that on October 16, 2000, he had advised Sterling about the 22' Hackercraft which was to be a tender to the vessel and the sale price of the vessel. This was prior to the renewal of the policy in October of 2000.

In August 2000, when Hainey received the renewal endorsement for the policy, he reviewed it and saw it was incorrect because it had not changed the navigational limits to include sailing to Florida and the Caribbean. He contacted Sterling to complain about this (Hainey, Tr. pp. 95-96). He pointed out to Sterling that that Sterling had wrote in his letter dated December 15, 1999 that upon renewal in October 1999, the navigation warranty would be adjusted to reflect additional operating areas.

On February 14, 2001, Hainey sent a Property Loss Notice to Marine MGA to advise them that the yacht was drydocked and the propeller damage was discovered. The boat was in Florida at that time. Marine MGA in error sent an adjuster to New York to look at the boat.

    A.    We had forwarded additional information that the damage that the vessel had occurred – first—no, yes, that was the first thing we had to do.

    Q.    And what happened after that?

> A. Marine MGA sent the adjuster to New York to look at the vessel.
>
> Q. What's the next thing that happened?
>
> A. Well, it was February, there's no yachts in New York in February. I had to call Marine MGA and inform them the boat was not in New York, it was in Florida.
>
> Q Who did you speak to at Marine MGA?
>
> A. John Sterling, again, it because a comedy of errors with these people, so I found it funny they sent someone to New York to see a boat in the middle of February.

(Hainey Tr. at pp. 100-101).

Eventually Marine MGA sent an adjuster to Florida to inspect the damage to the yacht. Florida was outside of the navigational limits of the original policy, but within the limits which Hainey had instructed Sterling on numerous occasions to correct in the policy. The yacht was flying the British Flag and had Cayman Islands printed on its hull, which would have been clearly visible to Marine MGA's claim adjuster while he inspected the yacht in Florida. After the inspection of the N.E.W.S. in Florida, CIC paid the claim of Clean Waste. Significantly, they did not attempt to rescind the policy at this time.

In April 2001, Taylor, ma... v..., advised Hainey about a personal injury claim submitted by Johan Fourie ("Fourie"), the former Chief Engineer of the N.E.W.S. (Hainey Tr. p. 100). Fourie was injured when he slipped and fell in the engine room while the yacht was

in Newport, Rhode Island, which was within the yacht's trading limits. Hainey forwarded this information to Marine MGA.

The injuries to Fourie were serious. He eventually had to have operations on both knees and has a permanent disability rating of 22% in his knees. On July 23, 2001, CIC sent Perrotti a notice of rescission and declination. The letter stated that the Fourie claim was denied and that the policy had been rescinded. The letter rescinded the policy on the following grounds:

1. Frank Perrotti, Jr. did not have a insurable interest in or was not the owner of the vessel;

2. Frank Perrotti transferred ownership of the vessel to Clean Waste after the inception of the policy in violation of General Conditions III of the policy; and

3. Misrepresentation of the vessel's ownership, homeport, and navigational area.

CIC commenced this declaratory judgment action on August 21, 2001 against Perrotti, and now moves for summary judgment.

Fourie arrested the vessel the N.E.W.S., and filed suit against the N.E.W.S., Frank Perrotti, Jr. and Clean Waste in Florida on November 13, 2001. CIC refused to appoint and pay counsel to defend the N.E.W.S., Frank Perrotti, Jr. and Clean Waste, even under a reservation of rights on the coverage issue. The defendants in that case posted bond to release the vessel and retained Holland & Knight and Robinson & Cole LLP to defend the Fourie litigation. Fourie was seeking $1,000,000.00 in damages, plus punitive damages. Perrotti, Jr. and Clean Waste settled this case on the eve of trial for $600,000.00, and incurred about $400,000.00 in legal fees and expenses to defend this claim. Perrotti will establish here that the facts stated

11

herein, in concert with the applicable law, prove that he did not intentionally misrepresent or conceal any material fact relevant to this insurance.

## ARGUMENT

### I. BURDEN OF PROOF

CIC has the burden of proving that Perrotti intentionally misrepresented or concealed material facts relating to this insurer.

### II. LEGAL ARGUMENT

#### A. UBERRIMAE FIDEI DOES NOT APPLY TO CIC'S POLICY

This Court in its ruling and Order dated July 16, 2003, stated that "The parties dispute concerning the proper interpretation of the policy is governed by Connecticut law."

##### 1. The Provisions in the Policy Set Forth The Standard For When The Policy Can Be Voided For The Misrepresentations and/or Omissions Of The Insured.

"An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract...as expressed in the language employed in the policy. Schultz v. Hartford Fire Ins. Co., 213 Conn. 696, 702, 569 A.2d 1131 (Conn. 1990). The policy words must be accorded their natural and ordinary meaning...[and] any ambiguity in the terms of an insurance policy must be construed in favor of the insured. Hansen v. Ohio Cas. Ins. Co., 239 Conn. 537, 542-43, 687 A.2d 122 (Conn. 1996).

The CIC Policy contained a specific provision that expressed the parties' agreement as to when the policy could be voided due to a misrepresentation or omission of the insured.

The CIC policy contained the following clause:

12

> 12. **Concealment and Misrepresentation:** All coverage provided by us will be voided if you <u>intentionally</u> conceal or misrepresent any material fact or circumstance relating to this insurance, whether before or after a loss. . . (emphasis added).

In <u>King v. Allstate Ins. Co.</u>, 906 F.2d 1537 (11th Cir. 1990), the court, considering this exact clause, held that the clause constituted the contractual opting out of the uberrimae fidei doctrine. <u>Id</u>. at 1540. The court, finding for the insured, noted that:

> It is clear that parties are free to "contract out" or "contract around" state or federal law with regard to an insurance contract so long as there is nothing void as to public policy or statutory about such a contact.

<u>King v. Allstate</u>, 906 F.2d at 1540.

<u>See</u> also, <u>Strickland Imports, Inc. v. Underwriter's at Lloyds, London</u>, 668 So. 2d 251, 253 (Fla. Dist. Ct. App. 1996)(construing the clause and holding that the terms of the insurance policy control as long as contracting out of the state law provisions did not violate public policy); <u>State Farm Fire & Casualty Co. v. Oliver</u>, 854 F.2d 416 (11th Cir. 1988)(holding that once the insurer sets its own contractual standards for assessing misrepresentations and concealments, it could not thereafter rely on a statute to impose a more stringent standard on the insured). In <u>King</u>, the court ruled that Allstate had to prove an intentional misrepresentation or concealment to rescind the policy.

<u>See</u> also, <u>Progressive Northern Insurance Co. v. Bachman</u>, (W.D.Wis. ??    ??  ??  ?, 2004 U.S. Dist. LEXIS 6823 which held that the doctrine of utmost good faith did not apply and

that state law should govern a marine insurer's claim for rescission of a yacht policy based on alleged misrepresentations by the insured.

This Court has ruled that Perrotti's interpretation of ¶12 of the Policy must be adopted. See, Ruling and Order, dated July 19, 2003 per Chatigny, J.

In this case, there is an issue of fact concerning each and every piece of information that CIC alleges was misrepresented by Perrotti and/or Clean Waste. Also, since the applicable standard is intentional under the terms of the CIC Policy, there is an issue of fact as to Perrotti's state of mind for each and every piece of information that CIC alleges was misrepresented by Perrotti and/or Clean Waste. CIC has the burden of proof on this issue.

### 2. Marine MGA Acted As CIC's Agent

Marine MGA was acting as the agent of CIC. In fact, there was an Agency Agreement between them. It is of no consequence to argue, as CIC attempts to do, that the Agency Agreement did not authorize Marine MGA to issue a policy on a vessel to a foreign corporation, or on a vessel that is registered outside the United States. The principal is bound by the actions of its agent if a third party dealing with the agent reasonably believes that the agent's actions are authorized. Tomlinson v. Board of Educ. of City of Bristol, 226 Conn. 704, 734, 629 A.2d 333 (Conn. 1993). The agent, then, binds the principal through its apparent authority. Id.

Significantly, Sterling never told Hainey that he did not have authority to insure Cayman registered vessels. CIC has not even attempted to claim        otti was made privy to the contents of the Agency Agreement between CIC and Marine MGA. Hainey, while acting as Perrotti's agent, was never alerted as to any limitations in the Agency Agreement.

14

Hainey approached Marine MGA because they advertised and represented to the public that they were specialists in marine insurance. Hainey relied on Marine MGA's purported expertise in placing the CIC Policy. Vessels are often registered outside the United States but used primarily in United States territorial waters, so Hainey would have no reason to know of any such limitation.

Clearly, third parties could reasonably believe that Marine MGA's actions were authorized by CIC. Sterling's affidavit stating that he did have such authority is of no relevance, and is a desperate attempt to justify sloppy and incompetent underwriting. CIC contrived to avoid paying a $600,000.00 personal injury claim, plus over $400,000.00 of defense fees and costs.

### 3. All Knowledge and Information Communicated to Marine MGA Is Imputed To CIC

Any information communicated to Marine MGA is imputed to CIC. MacKay v. Aetna Life Ins. Co., 118 Conn. 538, 173 A. 783 (Conn. 1934)(holding information communicated to or knowledge otherwise obtained by an insurance agent that is necessarily incident to that matter and affecting the liability of the company, is considered the knowledge of the insurer). This is well settled. In Perzy v. Inter Cargo Corp., 827 F. Supp. 1365, 1377 (N.D. Ill. 1993), the court held that it need not consider whether the doctrine of uberrimae fidei was still viable since it was not breached in any event because the insured had disclosed the material information to the broker that obtained the policy for it, and an agency agreement existed between the broker and the insurer. Thus, held the court, any knowledge that the broker had in preparing the certificate