[of insurance] was imputed to the insurance company as long as the insured had not acted in bad faith.

Here, the yacht was registered in the Cayman Islands when Perrotti sought to purchase it. Marine MGA was aware of this when they issued the policy. They had the Lombardi Survey which stated the yacht was registered in the Cayman Islands and might remain under Cayman registry under the new owner. The letter from Taylor to Lombardi which was sent to Sterling and Marine MGA also stated that the yacht might remain registered in the Cayman Islands. Hainey inserted the number "922" in the application in the section "navigation area," which was the correct navigational code for Perrotti's purposes. In addition, on two subsequent occasions, Hainey instructed Sterling to address and correct the codes. The Captain of the NEWS personally called Sterling and indicated to him the areas within which the NEWS intended to venture. The purchase and sale agreement for the NEWS clearly indicated that Clean Waste was the purchaser of the vessel, and that Clean Waste was a Cayman Islands corporation. The Lombardi survey described the vessel's intended use, its registration and its official homeport. In October 2000, Hainey forwarded to Sterling a Bill of Sale for a 22 foot Hackercraft that had been purchased by Clean Waste of Georgetown, Cayman Islands for $82,964.00, and asked Marine MGA to include it on the policy. (Hainey Tr. at p. 8). It was so included. The Bill of Sale clearly indicated that Clean Waste was the owner of the Hackercraft and that it was a Cayman Islands corporation.

16

CIC itself inspected the vessel, which had Cayman Islands written on its hull and flew a British flag. CIC itself received all of the documentation referenced here. CIC itself paid proceeds from the CIC Policy to Perrotti after Perrotti submitted a claim under it.

It is astonishing that armed with all of the above-referenced information and knowledge, CIC can actually argue that Perrotti made material misrepresentations or omissions. It strains the limits of credibility that CIC could claim any such misrepresentations or omissions, if they existed at all, were intentional. CIC acted in bad faith in rescinding the policy.

### 4. CIC Is Bound By Marine MGA'S Negligence

It is a fundamental precept of agency law that an agent's negligent acts bind its principal. Rich-Taubman Associates v. Commissioner of Revenue Services, 236 Conn. 613, 674 A.2d 805 (Conn. 1996); Fairfield County Nat. Bank v. Demichely, 185 Conn. 463, 470-71, 441 A.2d 569 (1981); Gateway Co. v. DiNoia, 232 Conn. 223, 240, 654 A.2d 342 (1995). Marine MGA was acting as the agent of CIC. Any negligent acts of Marine MGA during the course of these events are necessarily imputed to, and binding upon, CIC. Tomlinson, 226 Conn. at 734.

In this case, Hainey specifically informed Marine MGA that he was not aware of what information was relevant in placing the Policy, as he was not familiar with marine insurance. He submitted to Marine MGA any and all the information and documentation requested by it. He answered the questions posed to him by Sterling related to the issuance of the CIC Policy. He even followed up with Sterling after              moved at Sterling's lack of diligence in attending to matters relating to the CIC Policy. In this case, CIC is bound by its own acts of negligence, as well as those of Marine MGA.

17

### 5. CIC Has Waived Its Right To, And/Or Is Estopped From, Arguing That The CIC Policy Is Void.

#### a. **Waiver**

It is universally acknowledged that where the insurer possesses knowledge of facts that would invalidate the contract, and continues to collect premiums and act in accordance with the terms of the policy, it waives its right to avoid paying on the policy in the event of a loss. MacKay v. Aetna Life Ins. Co., 118 Conn. 538, 547 (Conn. 1934).

#### i. **Based on Marine MGA's Knowledge**

As already discussed at length, Marine MGA had all of the material information required by CIC to determine its risk under the CIC Policy. In Gilbert v. Continental Ins. Co., No. 14605, 1975 U.S. Dist. LEXIS 14202 (D. Conn. 1975), the insured listed only sinus infection and gallstones on an application for health insurance despite the existence of other illnesses of which the insured was well aware. While normally this omission on the application would render the policy void, in this case, the plaintiff argued that since the insurance company required him to undergo medical examinations by a certain Doctor Winters, it had waived the right to void the policy based on his medical history because the doctor questioned the insured during his examination, and all of the plaintiff's various illnesses were revealed to him or discovered by him. The plaintiff argued that the insurance company waived its right to void the policy because its agent, Dr. Winters, had knowledge of the plaintiff's illnesses. The court agreed, holding that absent a showing of collusion between Dr. Winters and the insured, the doctor's knowledge was imputed to the insurer, and the insurer waived its right to void the policy based on the insured's misrepresentations in the application. Id. at *6. It noted that continuing to collect premiums

18

after the insurer learns of the grounds [through knowledge imputed to it from its agent] which entitles it to treat the policy as void, results in the waiver of the insurance company to argue that the policy is void.

### ii. Based on CIC's Knowledge

In addition to the knowledge and negligence imputed to it by Marine MGA, CIC itself sent an adjustor to Florida to investigate the February 14, 2001 claim made by Perrotti. Florida was outside of the navigational limits of the original policy, but within the limits which Hainey had instructed Sterling on numerous occasions to correct in the policy. It is bewildering that CIC is arguing the policy is void based on a breach of the trading limits when it inspected the vessel to adjust the claim outside of the listed trading limits.

As part of the normal adjustment process, the adjuster would generate a report that would list the yacht's homeport, which is always clearly printed on the hull of a vessel. It would also list the yacht's port of registry, which is indicated by its flag, in this case, the British Flag. That information was, or should have been obtained by the adjuster and printed in the report. And, again, CIC never attempted to rescind the policy at that time. In fact, they paid the claim and then renewed the Policy. Clearly they have waived any right they may have had to rescind the Policy now.

### b. Estoppel

In Krauss v. Manhattan Life Ins. Co. of New York, 700 F 2d 870 (2d Cir. 1983) the court discussed estoppel in this context. In Krauss, the insured listed his occupation as secretary/treasurer in the insurance application. His employer, Lettercraft requested $50,000

worth of life insurance coverage for him. Krauss submitted another application a year later for an additional $50,000 in coverage, wherein he listed his occupation as Vice President, Business Executive, Corporate Attorney. Krauss, it turns out, was a part-time employee. The insurer refused to pay on the policy at his death because the policy limited coverage for part time employees to $25,000.

The court held that the insurer was estopped from relying on the limitations in the master policy as it had accepted the payments for the coverage without questioning Krauss's work status, and Krauss relied on the insurance coverage to his detriment instead of purchasing an alternate policy to protect his family. Similarly, Perrotti had been offered other policies and choose the CIC Policy. Had CIC or Marine MGA made him aware that they did not cover his particular situation, he would have chosen one of the other policies he was offered. He did not. He relied on the fact that he had coverage under the CIC Policy to protect him against exactly such a situation as the Fourie case, where one of Clean Waste's crew sustained serious personal injuries during the course of his employment.

The Krauss court noted that although delay in raising the issue of ineligibility does not necessitate a finding of estoppel, it is an important element in determining the reasonableness or fairness of the insurers conduct towards the insured. Here, as previously addressed at length, CIC had all of the material information and had even paid a prior claim on the Policy. Yet CIC never raised any issues of eligibility until Fourie was injured and CIC to indemnify and defend Perrotti. Thus, CIC has waived its right to claim that the CIC Policy is void ab initio, and is estopped from so arguing.

20

**B.   PERROTTI DID NOT MAKE MATERIAL MISREPRESENTATIONS OR OMISSIONS TO CIC OR MARINE MGA.**

Information on an insurance application is material if it affects the risk undertaken by the insurer. Commercial Union Ins. Co. v. Flagship Marine Services, Inc., 982 F. Supp. 310 (S.D.N.Y. 1997), *rev'd on other grounds*, 190 F.3d 26 (2d Cir. 1999). The insurer has a good faith duty to examine all of the documentation provided by the insured during the application process to determine its risk before it can claim the insured misrepresented a material fact. Id. at 314 (holding that the insurer had to consider, along with the application for insurance: (1) a copy of the expiring insurance policy and rate information relating thereto, (2) a full list of vessels, (3) a complete loss list, which would include in this case, the propeller damage claim, (4) a summary of general losses, (5) resumes of the captains, (6) a list of vessel minimum requirements, (7) certificates for certain captains indicating that they were accredited for commercial assistance and towing, and (8) vessel surveys). Here, all material information was supplied to CIC, and any information that was not supplied was not material and not requested.

**1.   Perrotti Disclosed To CIC That The Yacht Was Registered In The Cayman Islands**

As discussed at length above, all material information was supplied to CIC and Marine MGA. Sterling never asked Hainey any questions about the registry of the vessel, despite the fact that Hainey informed Sterling that he, Hainey, had no experience with marine insurance and did not know what information was important and material to the insurer. (Hainey Tr. at p. 142). Sterling reviewed the bill of sale for the Hackercraft and asked Hainey questions about it.

21

Q. As to the bill of sale document, does that indicate to whom title was transferred of the title?

A. Clean Waste, Inc.

Q. And your testimony was that you faxed that information on to Marine MGA?

A. Yes, I did.

Q. And did Mr. Sterling ever indicate to you that he had reviewed the bill of sale?

A. He did because he had questions.

Q. And what were those questions?

A. One was a question of the valuation, one was a question of the use of it and the other was the construction.

Q And did he ever ask you who Clean Waste, Inc. was?

A. No.

Q. To your knowledge, did Marine MGA add that vessel to the N.E.W.S. policy?

A. Yes, they did

Hainey Tr. at pp. 144-145.

No rescission of the policy occurred at this time. Even a casual review of the bill of sale would have revealed to Sterling the registry of the vessel and the name of the owner. In addition, the CIC Policy and Application contained no provision requiring that the vessel be registered in the U.S., nor does the policy state, or the application require, the name of the registered owner of the yacht.

CIC's assertion that it did not know the yacht was owned by Clean Waste, or that the vessel was registered in the Cayman Islands, was incorrect and in bad faith. There was not only any intentional misrepresentations or omissions made by the insured, there were no misrepresentations or omissions at all. CIC knew, or should have known, that the vessel was owned by Clean Waste, and that the vessel was registered in the Cayman Islands.

### 2.     Perrotti Did Not Misrepresent The Trading Limits Of The Yacht

CIC, in its notice of rescission and declination, alleged as one of its grounds for rescission that Perrotti had misrepresented the areas in which the yacht would be navigated. The evidence produced to date in discovery shows that the denial of coverage on this ground was not only incorrect but in bad faith. The denial of coverage was motivated by a desire to avoid responsibility for, and the defense of, the large claim of Chief Engineer Fourie, the cost of which was in excess $800,000.00.

In addition, the definition of insured in the CIC Policy covers Clean Waste in any event.

> ED. "You" and "your" mean the person or
> ...ation named as the insured on the enclosed
> Declarations Page, as well as members of the
> immediate family of the insured who live in the
> same household or anyone else operating the

23

insured vessel with the prior permission of the name insured as long as the actual use is within the scope of such permission. "You" and "Your" do not include a captain or crew who work on the boat or anyone operating or working for a marina yacht club boat report yard or similar business. We do not insure other people using your boat with your permission for their liability to you. The Lombardi survey which was provided to CIC, along with the application, expressly informed CIC of the intended trading range of the vessel. Page 3 of the survey in the preamble states as follows:

The prospective owner will be utilizing the boat as a personal yacht in New England waters for the summer months with the boat transiting the East Coast south in the fall in points in the Gulf of Mexico and Caribbean Sea during winter with return trips coastwise in the spring. With this in mind, I have been examining 'Sun Chaser' to determine her suitability to perform as an ocean going, blue water vessel, as well as examining her present structural integrity.

The application itself stated that the navigation was to be "Code 922" which states as follows:

922. Atlantic Costal Water–12 Months Navigation
"Warranted confined to the use and navigation of coastal waters and tributaries of the Atlantic Ocean and Gulf of Mexico, including the Bahamas, From Eastport, ME to Pensacola, FL."

The policy was not delivered to the insured until sometime in December of 1999 or January of 2000. The Captain of the vessel, and Chris Hainey, informed John Sterling of Marine MGA, that the limits in the policy were in___ ___ ___ should be changed. In John Sterling's letter of December 15, 1999, he acknowledged that he knew the trading limits would be extended

24

after the refit was completed. The yacht at no time during the initial policy period, or the renewal periods, was ever navigated or used outside of U.S. waters.

### 3.   The Name of The Vessel's Owner Was Not Material To CIC's Risk

Information on an insurance application is material if it affects the risk undertaken by the insurer. AXA Global Risks (UK) Ltd. v. Pierce, No. 00-388-Civ 2001 WL 1825853 (S.D. Fla., Nov. 8, 2001). In AXA, the court held that the name of the registered owner of the vessel, though not disclosed, was not material to the insurer's risk. The court noted that the name of the owner would be relevant if the owner had a previous loss history from which the insurer could deduce that a higher risk existed. Since, held the court, no prior loss history existed, no such increase in risk was shown. Similarly here, Clean Waste had no prior loss history and thus its ownership was not material to the insurer's risk.

In addition, the AXA court held that it was the insurer's burden to show that omitting the actual owner's name in the application was a material omission in that it affected the insurer's risk. The court held it particularly relevant that the insurance application form did not inquire into the name of the owner of the vessel, reasoning that if the name of the boat owner was material, the application form would have specifically requested it. Here, as well, the CIC application requested only the "named insured," making no reference to the registered owner. (Insurance App. EX. ). Finally, the AXA court held that it was the name of the operator, not the owner, that was material for the insurer to access its risk of loss in issuing policy. It was the operator whose loss history had to be determined in order to fairly access the risk. Sterling recognized this when he asked for the resume of Captain John McCaughey since the Captain

25

would be operating the sophisticated 110' motor yacht. Since said resume was duly provided, CIC was in possession of the material information regarding the vessel's operation from the onset of the transaction. Thus, this should not even be an issue raised to this court by CIC. At the very least, whether the pertinent information was in CIC or Marine MGA's possession, and whether the ownership information was material, raises a genuine issue of material fact.

### C.   PERROTTI HAD AN INSURABLE INTEREST IN THE YACHT

Perrotti had an insurable interest in the vessel. Perrotti owns 100% of the shares in Clean Waste, and is its director. Clean Waste is the registered owner of the N.E.W.S. Perrotti provided the funds to purchase the yacht. The yacht was used solely by him for pleasure in the territorial waters of the United States. It never entered the Caribbean waters anytime during the period this policy was in force.

Perrotti, being sole shareholder and director of Clean Waste, and sole user of the vessel, clearly had an insurable interest in the vessel. AXA Global Risks (UK) Ltd., at *3. In the AXA case, a vessel owned solely by Yola Pierre was stolen. The insurance for the vessel had been obtained in the name of her husband, Frank Pierre. After discovering the theft of the vessel, Frank Pierre attempted to collect the applicable insurance proceeds. The insurer refused to remit payment, arguing that Frank Pierre did not have an insurable interest in the vessel, as actual ownership was not in his name. The court disagreed, holding that as long as Frank had a pecuniary interest in the vessel, he was entitled           The relevant inquiry, held the court, was not whether Frank had a right of property, but whether Frank "would be injured by its [the vessel's] loss or benefited from its preservation." Id. at *3 (citing Hooper v. Robinson, 98 U.S.

26

528, 538 (1978); see also, Commercial Union Assur. Co., Ltd. of London v. Jass, 36 F.2d 9, 10 (5th Cir. 1929)(holding that any interest in property, legal or equitable, however slight, is insurable). The AXA court further held that an insurable interest is shown where a pecuniary, i.e., financial, fiscal, or economic interest is shown.

As noted above, Perrotti owns 100% of the shares in Clean Waste, which is the named owner of the N.E.W.S., and Perrotti provided Clean Waste the funds with which to purchase the N.E.W.S.. Thus, CIC's declination on the grounds that Perrotti did not have an insurable interest is specious and devoid of merit. Tellingly, the definition of insured in the CIC Policy itself includes "the person or organization named, member of the family, and people using the yacht with the permission of the insured."

**D. CIC BREACHED ITS DUTY TO DEFEND AND IS LIABLE FOR THE FOURIE JUDGMENT AND LEGAL FEES OF DEFENDANT THE FOURIE ACTION**

In Connecticut, an insurer who refuses to defend an insured will be obligated to indemnify the insured and will be found to have waived its right to raise any applicable coverage defenses if a determination is subsequently made that the insurer owed such an obligation to an insured. Black v. Goodwin, Loomis and Britton, Inc., 239 Conn. 144, 153, 681 A.2d 293 (1996). Connecticut follows the "majority rule" that "when an insurer has refused to defend its insured, it is in no position to argue that the steps the insured took to protect himself should insure to the insurer's benefit." Id. The insurer who wrongfully refuses to defend is also "... expenses the insured incurs in defending the suit. Alderman v. The Hanover Insurance Group, 169 Conn. 603, 363 A.2d 1102 (1975). CIC is liable to Perrotti for the $600,000.00 Fourie

27

Judgment and the attorney fees of Holland & Knight and Robinson & Cole LLP in defending that action totaling $251,472.93.

### E. PERROTTI IS ENTITLED TO RECOVER ITS LEGAL FEES OF DEFENDING THE DECLARATORY JUDGMENT ACTION

In <u>Aetna Life & Cas. Co. v. Gentile</u>, 1995 Conn. Super LEXIS 3444, the court held that where the insurer had refused to defend the underlying suit, and had initiated an action seeking declaration that it had no duty to defend, the prevailing insured was entitled to recover attorneys fees incurred in defending against the declaratory action. 1995 Conn. Super LEXIS 3444 at *15-16. Indeed, in <u>General Plasma, Inc. v. Reliance Ins. Co.</u>, 2000 Conn. Super LEXIS 68, the court went a step further, holding that regardless of whether the insurer or insured initiated the declaratory action, if such determined that defense in the underlying suit had been wrongfully denied, the prevailing insured would be entitled to recover attorneys fees incurred for the declaratory action. 2000 Conn. Super LEXIS 68 at *15-16. Furthermore, in reaching this holding the court favorably acknowledged 8th Cir. precedent holding:

> If an insurer faithfully fulfills its duty to defend its insured and also brings a declaratory judgment action to determine insurance coverage, then there will be no breach of the duty to defend.... Thus in a scenario where the insurer fulfills its duty to defend and also contests coverage, the insured is not entitled to attorneys fees and costs in the declaratory judgment action to determine coverage.

Gene[ral Pla]sma at *19, quoting <u>Chicago Title Ins. Co. v. F.D.I.C.</u>, 172 F.3d 601, 605 (8th Cir. 1999).

## CONCLUSION

Perrotti did not intentionally misrepresent the registry of the Yacht, the ownership of the Yacht, or the trading limits of the Yacht. CIC wrongfully voided the policy and breached its duty to defend Perrotti, and is liable for damage to Perrotti as follows:

1. The Fourie Judgment of $600,000.00;

2. The legal costs and fees of defending the Fourie Action which total $251,472.94;

3. The legal costs and fees of defending this Declaratory Judgment action totals $182,856.37; and

4. Interest on each of the foregoing.

DEFENDANT,
FRANK PERROTTI, JR.

By: _____
John L. Senning
Senning & Rieder
The Essex Law Group
16 Saybrook Road
Essex, Connecticut 06426
Tele: 860.767.2618
Fax: 860.767.2618
jlssealaw@aol.com